01

02

03

04

05                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF CALIFORNIA

06

07  RICHARD E. KARR,                    )
                                        )
08         Petitioner,                  )    CASE NO. 2:07-cv-00510-RSL-JLW
                                        )
09         v.                           )
                                        )
10  D.K. SISTO, Warden,                 )    REPORT AND RECOMMENDATION
                                        )
11         Respondent.                  )
    _____)

12

13         I.      SUMMARY

14         Petitioner Richard E. Karr is currently incarcerated at the California State Prison,

15  Solano in Vacaville, California.  He was convicted by a jury of first degree murder in

16  Alameda County Superior Court on March 3, 1976, and sentenced to seven-years-to-life with

17  the possibility of parole.  He has filed a petition for writ of habeas corpus, together with

18  relevant portions of the state court record, under 28 U.S.C. § 2254 challenging his 2005 denial

19  of parole by the Board of Parole Hearings of the State of California (the "Board").[1]  (*See*

20  Docket 1 at 1-64.)  Respondent has filed an answer to the petition, and petitioner has filed a

21  traverse in reply to the answer.  (*See* Dkt. 6; Dkt. 7.)  The briefing is now complete and this

22  _____
         [1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on
    July 1, 2005.  *See* California Penal Code § 5075(a).

    REPORT AND RECOMMENDATION -1

01 matter is ripe for review.  The Court, having thoroughly reviewed the record and briefing of

02 the parties, recommends that the Court deny the petition, and dismiss this action with

03 prejudice.

04       II.      BACKGROUND

05       Petitioner participated in the murder of the victim, Robert Sweeney, because he

06 believed the victim was a "snitch" who had informed police of petitioner's

07 involvement in a large drug trafficking conspiracy involving several co-conspirators.

08 (*See* Dkt. 6, Exhibit 3 at 9-14.)  On August 9, 1974, petitioner and his co-conspirators

09 interrogated and severely beat the victim, and then bound him with twine and gagged

10 him.  (*See id*. at 11-12.)  After the victim was placed in the trunk of petitioner's

11 vehicle, petitioner drove to the highest point of the San Mateo Bridge.  Although the

12 victim was still alive, he was thrown off the bridge into the water below.  (*See id*. at

13 12.)  His body was found floating in the San Francisco Bay the next day.  (*See id*.)

14       When petitioner was arrested a few days later, authorities found in his home a

15 thirty-eight caliber revolver, a copy of the Daily Review containing an article about

16 the victim's death, and several copies of a tape the victim made on the day he died.

17 (*See id*. at 12.)  The victim apparently suspected that he was about to be murdered by

18 petitioner and his co-conspirators, because he began the tape, "This is the story of my

19 life."  (*Id*. at 11.)

20       Evidence admitted at petitioner's trial revealed that petitioner and his co-

21 conspirators had previously abducted, beaten, and interrogated another suspected

22 informant, Barry Krell, in the same manner as the victim in July 1974.  (*See id*. at 13-

01 14.) Tapes of this interrogation were also found at petitioner's home. (*See id*. at 14.)

02 Although the co-conspirators threatened to throw Krell from the San Mateo Bridge to

03 his death, they dumped him out on the bridge instead. (*See id*. at 13-14.)

04       Petitioner was convicted by a jury of first degree murder in Alameda County Superior

05 Court on March 3, 1976, and was originally sentenced to death. (*See id.*, Ex. 4 at 1; *id*., Ex.

06 2.) In a separate case, however, the California Supreme Court later held that the provisions of

07 the death penalty statute under which petitioner had been sentenced were unconstitutional,

08 and that the remedy for prisoners like petitioner is commutation to a life sentence. (*See id*.,

09 Ex. 2 at 7-10.) Accordingly, the California Court of Appeal modified petitioner's judgment.

10 Petitioner received a sentence of seven-years-to-life with the possibility of parole rather than

11 the death penalty. (*See id*., Ex. 1 at 1-2.) His minimum eligible parole date was set for

12 August 14, 1981. (*See id*., Ex. 3 at 1.)

13       The parole denial which is the subject of this petition took place after a parole hearing

14 held by the Board on August 2, 2005. (*See id*.) This was petitioner's nineteenth parole

15 consideration hearing, and the Board denied his application for parole for one year. (*See id*. at

16 57.) As of the date of the 2005 parole hearing, petitioner was fifty-six-years-old and had been

17 in custody for approximately twenty-nine years. (*See id*. at 46 and 51.)

18       After denial of his 2005 application, petitioner filed habeas corpus petitions in the

19 Alameda County Superior Court, California Court of Appeal, and California Supreme Court.

20 (*See* Dkt. 1, Ex. P; Dkt. 6, Exs. 8 and 9.) Those petitions were unsuccessful. (*See* Dkt. 6,

21 Exs. 8 and 9.) This federal habeas petition followed. Petitioner contends his 2005 denial by

22 the Board violated his federal due process rights. Thus, petitioner does not challenge the

REPORT AND RECOMMENDATION -3

01 validity of his conviction, but instead challenges the Board's 2005 decision finding him

02 unsuitable for parole.

03      III.    STANDARD OF REVIEW

04      The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

05 petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

06 320, 326-27 (1997).  Because petitioner is in custody of the California Department of

07 Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

08 vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)

09 (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in

10 custody pursuant to a state court judgment, even when the petitioner is not challenging his

11 underlying state court conviction.").  Under AEDPA, a habeas petition may not be granted

12 with respect to any claim adjudicated on the merits in state court unless petitioner

13 demonstrates that the highest state court decision rejecting his petition was either "contrary to,

14 or involved an unreasonable application of, clearly established Federal law, as determined by

15 the [U.S.] Supreme Court," or "was based on an unreasonable determination of the facts in

16 light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

17      As a threshold matter, this Court must ascertain whether relevant federal law was

18 "clearly established" at the time of the state court's decision.  To make this determination, the

19 Court may only consider the holdings, as opposed to dicta, of the U.S. Supreme Court.  *See*

20 *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit precedent

21 remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

22  331 F.3d 1062, 1069 (9th Cir. 2003).

REPORT AND RECOMMENDATION -4

01        The Court must then determine whether the state court's decision was "contrary to, or

02   involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

03   *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

04   grant the writ if the state court arrives at a conclusion opposite to that reached by [the

05   Supreme] Court on a question of law or if the state court decides a case differently than [the]

06   Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

07   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

08   state court identifies the correct governing legal principle from [the] Court's decisions but

09   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

10   times, a federal habeas court must keep in mind that it "may not issue the writ simply because

11   [it] concludes in its independent judgment that the relevant state-court decision applied clearly

12   established federal law erroneously or incorrectly.  Rather that application must also be

13   [objectively] unreasonable."  *Id.* at 411.

14        In each case, the petitioner has the burden of establishing that the state court decision

15   was contrary to, or involved an unreasonable application of, clearly established federal law.

16   *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

17   whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

18   state court decision because subsequent unexplained orders upholding that judgment are

19   presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

20   (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

21        Finally, AEDPA requires federal courts to give considerable deference to state court

22   decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

REPORT AND RECOMMENDATION -5

01 Federal courts are also bound by a state's interpretation of its own laws. *See Murtishaw v.*

02 *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

03 (9th Cir. 1993)).

04      IV.     FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

05      A.     *Due Process Right to be Released on Parole*

06      Under the Fifth and Fourteenth Amendments to the U.S. Constitution, the government

07 is prohibited from depriving an inmate of life, liberty or property without the due process of

08 law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be analyzed in two

09 steps: the first asks whether the state has interfered with a constitutionally protected liberty or

10 property interest of the prisoner, and the second asks whether the procedures accompanying

11 that interference were constitutionally sufficient. *Ky. Dep't of Corrs. v. Thompson*, 490 U.S.

12 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006).

13      Accordingly, our first inquiry is whether petitioner has a constitutionally protected

14 liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

15 *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

16 U.S. 369 (1987). *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

17 "the 'clearly established' framework of *Greenholtz* and *Allen"* to California's parole scheme).

18 The Court in *Greenholtz* determined that although there is no constitutional right to be

19 conditionally released on parole, if a state's statutory scheme employs mandatory language

20 that creates a presumption that parole release will be granted if certain designated findings are

21 made, the statute gives rise to a constitutional liberty interest. *See Greenholtz*, 442 U.S. at 7,

22 12; *Allen*, 482 U.S. at 377-78.

REPORT AND RECOMMENDATION -6

01       As discussed *infra*, California statutes and regulations afford a prisoner serving an

02  indeterminate life sentence an expectation of parole unless, in the judgment of the parole

03  authority, he "will pose an unreasonable risk of danger to society if released from prison."

04  Title 15 Cal. Code Regs., § 2402(a).  The Ninth Circuit has therefore held that "California's

05  parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion*,

06  306 F.3d at 902.  To similar effect, *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007), held

07  that California Penal Code § 3041 vests all "prisoners whose sentences provide for the

08  possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

09  release date, a liberty interest that is protected by the procedural safeguards of the Due

10  Process Clause."  This "liberty interest is created, not upon the grant of a parole date, but

11  upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).  *See also*

12  *Sass*, 461 F.3d at 1127.

13       Because the Board's denial of parole interfered with petitioner's constitutionally-

14  protected liberty interest, this Court must proceed to the second step in the procedural due

15  process analysis and determine whether the procedures accompanying that interference were

16  constitutionally sufficient.  "[T]he Supreme Court [has] clearly established that a parole

17  board's decision deprives a prisoner of due process with respect to this interest if the board's

18  decision is not supported by 'some evidence in the record.'" *Irons*, 505 F.3d at 851 (citing

19  *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

20  applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

21  Court to determine "whether there is any evidence in the record that could support the

22  conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56.  Although *Hill*

REPORT AND RECOMMENDATION -7

01 involved the accumulation of good time credits rather than release on parole, later cases have

02 held that the same constitutional principles apply in the parole context because both situations

03 directly affect the duration of the prison term. *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

04 1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

05 Court in *Hill* in the parole context); *accord*, *Sass*, 461 F.3d at 1128-29); *Biggs*, 334 F.3d at

06 915; *McQuillion*, 306 F.3d at 904.

07        "The fundamental fairness guaranteed by the Due Process Clause does not require

08 courts to set aside decisions of prison administrators that have some basis in fact," however.

09 *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

10 the entire record, independently assess witnesses' credibility, or re-weigh the evidence. *Id.* at

11 455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

12 *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

13 habeas review when it upheld the finding of the prison administrators despite the Court's

14 characterization of the supporting evidence as "meager." *See id.* at 457.

15        B.      *California's Statutory and Regulatory Scheme*

16        In order to determine whether "some evidence" supported the Board's decision with

17 respect to petitioner, this Court must consider the California statutes and regulations that

18 govern the Board's decision-making. *See Biggs*, 334 F.3d at 915.  Under California law, the

19 Board is authorized to set release dates and grant parole for inmates with indeterminate

20 sentences. *See* Cal. Penal Code § 3040 and 5075, *et seq.*  Section 3041(a) requires the Board

21 to meet with each inmate one year before the expiration of his minimum sentence and

22 normally set a release date in a manner that will provide uniform terms for offenses of similar

01  gravity and magnitude with respect to their threat to the public, as well as comply with

02  applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

03  date "unless it determines that the gravity of current convicted offense or offenses, or the

04  timing and gravity of current or past convicted offense or offenses, is such that consideration

05  of the public safety requires a more lengthy period of incarceration." *Id.*, § 3041(b).  Pursuant

06  to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

07  dates" which take into account the number of victims of the offense as well as other factors in

08  mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

09  setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

10  § 2402, *et seq.*

11      Accordingly, the Board is guided by the following regulations in making a

12  determination whether a prisoner is suitable for parole:

>  (a) General. The panel shall first determine whether the life
>  prisoner is suitable for release on parole. Regardless of the
>  length of time served, a life prisoner shall be found unsuitable
>  for and denied parole if in the judgment of the panel the
>  prisoner will pose an unreasonable risk of danger to society if
>  released from prison.
>
>  (b) Information Considered. All relevant, reliable information
>  available to the panel shall be considered in determining
>  suitability for parole. Such information shall include the
>  circumstances of the prisoner's social history; past and present
>  mental state; past criminal history, including involvement in
>  other criminal misconduct which is reliably documented; the
>  base and other commitment offenses, including behavior before,
>  during and after the crime; past and present attitude toward the
>  crime; any conditions of treatment or control, including the use
>  of special conditions under which the prisoner may safely be
>  released to the community; and any other information which
>  bears on the prisoner's suitability for release. Circumstances
>  which taken alone may not firmly establish unsuitability for

01    parole may contribute to a pattern which results in a finding of
02    unsuitability.

03  15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

04 factors to further assist the Board in analyzing whether an inmate should be granted parole,

05 although "the importance attached to any circumstance or combination of circumstances in a

06 particular case is left to the judgment of the panel." 15 CCR § 2402(c).

07   In examining its own statutory and regulatory framework, the California Supreme

08 Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is

09 "whether some evidence supports the *decision* of the Board . . . that the inmate constitutes a

10 current threat to public safety, and not merely whether some evidence confirms the existence

11 of certain factual findings."  *In re Lawrence*, 44 Cal.4th 1181, 1212 (2008).  The *Lawrence*

12 court also asserted that the Board's decision must demonstrate "an individualized

13 consideration of the specified criteria," but "[i]t is not the existence or nonexistence of

14 suitability or unsuitability factors that forms the crux of the parole decision; the significant

15 circumstance is how those factors interrelate to support a conclusion of current dangerousness

16 to the public."  *Id*. at 1204-05, 1212.  As long as the evidence underlying the Board's decision

17 has "some indicia of reliability," parole has not been arbitrarily denied.  *See Jancsek*, 833 F.2d

18 at 1390.  As the California courts have continually noted, the Board's discretion in parole

19 release matters is very broad.  *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code,

20 corresponding regulations, and California law clearly establish that the fundamental

21 consideration in parole decisions is public safety and an assessment of a prisoner's current

22 dangerousness.  *See id.* at 1205-06.

REPORT AND RECOMMENDATION -10

01          C.      *Summary of Governing Principles*

02          By virtue of California law, petitioner has a constitutional liberty interest in release on

03   parole.  The parole authorities may decline to set a parole date only upon a finding that

04   petitioner's release would present an unreasonable present risk of danger to society if he is

05   released from prison.  Where the parole authorities deny release, based upon an adverse

06   finding on that issue, the role of a federal habeas court is narrowly limited.  It must deny relief

07   if there is "some evidence" in the record to support the parole authority's finding of present

08   dangerousness.  The penal code, corresponding regulations, and California law clearly support

09   the foregoing interpretation.

10          V.      PARTIES' CONTENTIONS

11          Petitioner contends that the Board violated his federal due process rights by finding

12   him unsuitable for parole without any "evidence demonstrating that Petitioner is currently a

13   threat to public safety."  (Dkt. 1 at 2; *see id*. at 38-60.)  He also argues that the Board's

14   consistent denial of parole reflects either a "no parole policy" for life prisoners, or "displays a

15   bias and predisposition to find against Petitioner at every hearing" in violation of his due

16   process rights.  (*Id*. at 21 and 28-31.)  In addition, petitioner claims that his right to be free

17   from cruel and unusual punishment under the Eighth Amendment was violated by the Board's

18   failure to "fix a term of imprisonment proportionate to Petitioner's individual culpability" as

19   he asserts is required for prisoners whose commitment offense took place prior to 1977.  (*Id*.

20   at 2; *see id*. at 30-31 and 61-64.)  Finally, petitioner argues that his right to be free from ex

21   post facto laws was violated by the parole denial, which imposed "a more [harsh] and

22   burdensome sentence" by arbitrarily converting his sentence of life with the possibility of

01 parole into life without the possibility of parole.  (*Id*. at 30; *see id*. at 31.)

02       Respondent claims that petitioner does not have a constitutionally protected liberty

03 interest in being released on parole, that the "some evidence" standard is inapplicable in this

04 context, and that even if he does have a protected liberty interest, the Board adequately

05 predicated its denial of parole on "some evidence."  (*See* Dkt. 6 at 1-12.)  Accordingly,

06 respondent argues that petitioner's due process rights were not violated by the Board's 2005

07 decision, and the Alameda County Superior Court's Order upholding the parole denial was

08 not an unreasonable application of clearly established federal law.  (*See id*. at 12-14.)

09       VI.     ANALYSIS OF RECORD IN THIS CASE

10       A.     *State Court Proceedings*

11       Following the Board's parole denial, petitioner filed three unsuccessful habeas

12 petitions in the state courts.  The Alameda County Superior Court denied his habeas petition

13 in a reasoned decision, and petitioner's habeas petitions filed in the California Court of

14 Appeal and California Supreme Court were both summarily denied.  (*See id*., Exs. 5-11.)

15 Respondent admits that petitioner's habeas petition was timely, and that petitioner properly

16 exhausted each of his claims before the California Supreme Court.  (*See id*. at 4.)

17 Accordingly, this Court reviews the Alameda County Superior Court's Order upholding the

18 Board's decision to determine whether it meets the deferential AEDPA standards, as it is the

19 last reasoned state court decision.  *See Ylst*, 501 U.S. at 803-04.

20       B.     *Petitioner's First Due Process Claim*

21       The Board based its decision that petitioner was unsuitable for parole primarily upon

22 the aggravated circumstances of his commitment offense, but also cited petitioner's

REPORT AND RECOMMENDATION -12

01  insufficient psychological evaluation, lack of employment plans, and opposition from the

02  Alameda County District Attorney to petitioner's release on parole.  (*See* Dkt. 6, Ex. 3 at 53-

03  59.)  Thus, the Board's findings tracked the applicable suitability and unsuitability factors

04  listed in § 2402(b), (c) and (d) of title 15 of the California Code of Regulations.  *See also*

05  *Lawrence*, 44 Cal.4th at 1214 (holding that "the aggravated nature of the crime does not in

06  and of itself provide some evidence of *current* dangerousness to the public unless the record

07  also establishes that something in the prisoner's pre- or post-incarceration history, or his or

08  her current demeanor and mental state, indicates that the implications regarding the prisoner's

09  dangerousness that derive from his or her commission of the commitment offense remain

10  probative to the statutory determination of a continuing threat to public safety.")  After

11  considering all reliable evidence in the record, the Board concluded that evidence of

12  petitioner's suitability did not outweigh the evidence of his unsuitability for parole.  (*See* Dkt.

13  6, Ex. 3 at 53.)

14          With respect to petitioner's commitment offense, the Board found the circumstances

15  of the first degree murder to be particularly aggravated, because he "plan[ned], with his

16  confederates, to kidnap [the victim], torture him by beating him unmercifully, and then after

17  [petitioner and his crime partners had] done that for a period of time, bag him up and take him

18  to the top of the bridge and, while he was still alive and [petitioner] knew it, dump him into

19  the Bay."  (*Id*. at 54.)  The Board concluded that petitioner's crime was "extremely egregious.

20  It cause[d] one jury to conclude that [petitioner should] be sentenced to death, and that was

21  changed by the decision of the Supreme Court, [but] anyone who reads these circumstances is

22  going to conclude, as we have concluded in assessing [petitioner's] suitability, that this is a

01   very horrendous [offense]. . . ."  (*Id*. at 55.)  In addition, the Board found that the offense was

02   "carried out in a dispassionate and a calculated manner such as an execution style murder.

03   The victim was abused, defiled and (indiscernible) during or after the offense.  The offense

04   was carried [out] in a manner which demonstrated an exceptionally callous disregard for

05   human suffering. . . ."  (*Id*. at 53.)  *See* 15 CCR § 2402(c)(1)(B), (C) and (D).  Moreover, the

06   Board observed that it "was not an isolated incident . . . [petitioner] used this offense for the

07   object lesson that [he] wanted to carry forth . . . to anybody who interfered with [his]

08   operation at the time."   (Dkt. 6, Ex. 3 at 55.)

09          The second factor cited by the Board was petitioner's most recent psychological

10   evaluation prepared by Dr. Rouse in 2002, which the Board found did not support a finding of

11   suitability because it was inconclusive as to petitioner's current dangerousness.  (*See id*. at

12   56.)  California law requires the Board to consider "[a]ll relevant, reliable information

13   available to the panel," including a prisoner's "past and present mental state" and "past and

14   present attitude toward the crime."  15 CCR § 2402(b).  In his report, Dr. Rouse asserted that

15   petitioner presented a low risk of dangerousness when compared to other inmates at CSP-

16   Solano, but he did not compare petitioner's dangerousness with average citizens in the

17   community or discuss how petitioner would fare if released into the community.  (*See id*. at

18   56.)  The Board asserted that this omission by the psychologist would not "be considered a

19   negative in, you know, the final determination for suitability, and certainly, in no way makes

20   [petitioner] responsible for what is or is not in the evaluation report."  (*Id*. at 32.)  The Board

21   was concerned, however, that in addition to this omission, Dr. Rouse qualified his other

22   findings in the report as being "limit[ed by] the information available to the psychologist and

01  the psychologist being unable to assess other positive factors that might otherwise be

02  considered in the report." (*Id*. at 56.)  Furthermore, the Board expressed concern that the

03  report was too outdated to provide much support for a suitability determination at the time of

04  the 2005 hearing, because it was at least three years old.  (*Id*. at 58.)  As a result, the Board

05  concluded that the report was "of limited value in confirming [petitioner's] suitability, and it's

06  questionable, and casts doubt upon [petitioner's] suitability. . . ." (*Id*. at 56.)  Accordingly,

07  the Board recommended that the report "be updated to address [the panel's] concerns" before

08  petitioner's next parole hearing.  (*Id*. at 57; *see id*. at 30.)

09          This Court finds that the Board's conclusion that an updated psychological evaluation

10  was necessary before petitioner could be found suitable for parole at the 2005 hearing was

11  amply supported by evidence in the record.  Specifically, although Dr. Rouse found that

12  petitioner "expressed culpability for his life offense and expressed an appropriate amount of

13  remorse" on the date of his August 2002 psychological evaluation, petitioner declined to

14  discuss the circumstances of the commitment offense with the panel and also failed to express

15  any remorse regarding the victim's death during his August 2005 parole hearing.  (Dkt. 1, Ex.

16  B at 1; *see* Dkt. 6, Ex. 3 at 6-7 and 46-52.)  *See also* 15 CCR § 2402(d)(3) (providing that a

17  prisoner's "signs of remorse," including evidence that he "understands the nature and

18  magnitude of the offense" is a factor tending to show suitability for parole).  Instead,

19  petitioner told the panel that the victim "was my dearest, closest and best friend.  What

20  happened to him that night will only be between the five of us that were there that night.  I

21  will not belittle, I won't besmirch him.  We're not talking about him."  (Dkt. 6, Ex. 3 at 50.)

22  This comment by petitioner in 2005 may indeed reflect a continuing attitude that the law,

REPORT AND RECOMMENDATION -15

01 generally, may not apply to petitioner in situations which are somehow the private preserve of

02 the people who are present.  In any event, the apparent constraints on Dr. Rouse's findings,

03 coupled with the outdated nature of the report, support the Board's conclusion.

04       The third factor relied upon by the Board was petitioner's insufficient plans for

05 employment, because "it wouldn't be right for [the panel] to simply assume that [petitioner is]

06 . . . going to get a job in the optical areas" if released on parole.  (*Id*. at 35 and 57.)  *See also*

07 15 CCR § 2402(d)(8) (providing that a prisoner's "realistic plans for release or [development

08 of] marketable skills that can be put to use upon release" constitutes a factor tending to

09 indicate suitability for parole).  The Board acknowledged petitioner's strong residential plans

10 for parole, which would involve petitioner moving in with his current wife, Nancy, in

11 Vacaville.  (*See* Dkt. 6, Ex. 3 at 17.)  It also noted his substantial experience, training, and

12 certifications in the optical and construction fields, including his 2004 certifications from the

13 Electronics Technicians Association and "PIA Optical."  (*See id*. at 25-28.)  When the Board

14 specifically asked petitioner about his employment plan, however, petitioner admitted, "I

15 really haven't – really, I don't know what jobs are presented to me or what I would have to

16 do.  You know, I'm willing to do anything that it would take to get me employed."  (*Id*. at 36-

17 37.)  He also stated, "So, you know what, excuse me, for me the [optical] field is wide open

18 . . . I can become a teacher, a trainer or – do anything."  (*Id*. at 38.)  The Board ultimately

19 disagreed, finding that petitioner needed to "become more aggressive in being more specific

20 about where [he] might be employed on release prior to [his] next hearing."  (*Id*. at 57.)

21 Especially in light of the Board's broad discretion to attach importance to any "information

22 which bears on the prisoner's suitability for release," the Board could reasonably conclude

REPORT AND RECOMMENDATION -16

01   that petitioner needed to establish firm employment plans before his parole plans could be

02   considered realistic.  15 CCR § 2402(b); *see id*. § 2402(d)(8).

03            Petitioner argues that the Board erred by considering a letter of opposition to

04   petitioner's release on parole from the Alameda County District Attorney during his parole

05   hearing.  (*See* Dkt. 1 at 21.)  Specifically, the District Attorney asserted that "on behalf of

06   Alameda County, we object to parole in the strongest possible terms.  Inmate Karr is a sick

07   sadistic (indiscernible) murderer who has no remorse for his victim and will never ever be

08   safe enough to be released.  Parole for this prisoner should be denied now and forever."  (Dkt.

09   6, Ex. 3 at 20.)  Contrary to petitioner's assertion, however, in making its suitability

10   determination the Board must "take into account all pertinent information and input about the

11   particular case from the inmate's victims, the officials familiar with his or her criminal

12   background, and other members of the public who have an interest in the grant or denial of

13   parole to this prisoner."  *In re Dannenberg,* 34 Cal.4th 1061, 1086 (2005).  California law

14   affords a prosecutor the opportunity to "comment on the facts of the case and present an

15   opinion about the appropriate disposition."  *See* Cal. Penal Code § 3041.7; 15 CCR § 2030.

16   Because the Board relied upon other reliable evidence of petitioner's unsuitability for parole,

17   in addition to its consideration of opposition by law enforcement, its consideration of the

18   District Attorney's opinion did not render the Board's conclusion arbitrary and capricious.

19   (*See* Dkt. 6, Ex. 3 at 18-20.)  *See also Rosenkrantz v. Marshall,* 444 F. Supp. 2d 1063, 1080

20   n.14 (C.D. Cal. 2006).

21            In addition, contrary to petitioner's argument that the Board failed to consider or give

22   appropriate weight to the parole suitability rules which favored petitioner, the Board did not

REPORT AND RECOMMENDATION -17

01   rely upon petitioner's numerous disciplinary violations in prison as a basis for finding him

02   unsuitable for parole because they were committed at least fifteen years before the hearing.

03   (*See* Dkt. 6, Ex. 3 at 21-22 and 55-56.)  *See also* 15 CCR § 2402(c)(6) (providing that a

04   prisoner's serious misconduct in prison or jail constitutes a factor indicating unsuitability for

05   parole).  A "CDC 115" documents a prisoner's misconduct believed to be a violation of law

06   or otherwise not minor in nature.  *See* 15 CCR § 3312(a)(3).  The Board noted that

07   petitioner's "initial behavior in the institution was far from exemplary, and [he was] subject to

08   . . . eight different serious 115s, the last one was in '89."  (Dkt. 6, Ex. 3 at 55.)  Specifically,

09   petitioner received 115s in "June '79, [for] assault on an inmate; May 1980, possession of a

10   hypodermic kit; May 1981, possession of inmate manufactured alcohol; May 1982,

11   possession of inmate manufactured stabbing instrument; October '81, possession of

12   hypodermic needles and syringes; January of 1983, [possession of] stimulants and sedatives;

13   and the other two [115s] were relatively minor."  (*Id*. at 21.)  Based upon these serious

14   disciplinary violations, the Board observed that "some 15 years ago, to say or to describe you

15   as a disciplinary problem, wouldn't address accurately the situation."  (*Id*.)  When petitioner

16   was initially incarcerated, he "continued to be the person [he was] perceived to be when [he]

17   came in here.  Hot shot drug kingpin, outlaw, don't mess with me type of guy."  (*Id*. at 55-56.)

18   The Board acknowledged, however, that petitioner later made "a substantial change"

19   in his behavior "from very, very serious 115s to none at all."  (*Id*. at 21.)  "Obviously

20   [petitioner] started making different kinds of decisions."  (*Id*. at 21-22.)  Petitioner explained

21   that he modified his behavior after a group of life term prisoners "took me under their wing.

22   These are guys that were lifers at the time . . . They got me interested in other things other

REPORT AND RECOMMENDATION -18

01  than what I was doing." (*Id*. at 22.)  Petitioner also stated, "A psychiatrist in San Quentin told

02  me there's two outcomes.  He said you're either going to be institutionalized or make a

03  change." (*Id*.)  As a result, the Board's observed that petitioner has "in essence been

04  discipline free, programming successfully, since that period of time." (*Id*. at 56.)

05          Furthermore, the Board did not base its decision that petitioner was unsuitable for

06  parole upon petitioner's juvenile or adult pre-conviction criminal record.  *See* 15 CCR

07  § 2402(b) (requiring the Board to consider a prisoner's "past criminal history, including

08  involvement in other criminal misconduct which is reliably documented"); *id*. § 2402(d)(1)

09  (lack of juvenile history of assaulting others or committing crimes with a potential of personal

10  harm to victims may tend to indicate suitability for parole).  Specifically, the Board noted that

11  petitioner had "no juvenile record, and [although he was] arrested in 1966 for possession of

12  marijuana . . . the State would not prosecute.  And on June 8, 1972, [petitioner] deserted from

13  the United States Army.  Disposition noted was that the Army did not prosecute that action."

14  (Dkt. 6, Ex. 3 at 14.)  Although petitioner admitted to smoking a lot of marijuana and

15  experimenting with methamphetamine prior to his incarceration, petitioner asserts that he has

16  refrained from using drugs since approximately 1979 when he ingested an unknown substance

17  that made him psychotic and impaired his motor skills for a month while he was incarcerated

18  at San Quentin.  (*See id*. at 16.)

19          It is therefore an inaccurate characterization of the record to say that the Board failed

20  to consider evidence that favored petitioner, or found him unsuitable for parole based solely

21  upon the commitment offense without any evidence of current dangerousness.  (*See* Dkt. 1 at

22  2, 20, and 57-60.)  As stated above, it is beyond the authority of a federal habeas court to

REPORT AND RECOMMENDATION -19

01  determine whether evidence of suitability outweighs the circumstances of the commitment

02  offense, together with any other reliable evidence of unsuitability for parole.  The Board has

03  broad discretion to determine how suitability and unsuitability factors interrelate to support its

04  conclusion of current dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.

05  Although the Board praised petitioner's progress in prison, it ultimately found that the

06  aggravated circumstances of petitioner's offense, psychological evaluation, lack of

07  employment plans, and opposition from the Alameda County District Attorney indicated that

08  petitioner would pose an unreasonable risk of danger to society or a threat to public safety if

09  released from prison.  (*See* Dkt. 6, Ex. 3 at 53.)  Based upon the information discussed above

10  and the record before this Court, the Board's conclusion that petitioner was unsuitable for

11  parole at the time of the 2005 hearing was properly supported by "some evidence" of current

12  dangerousness.

13       C.       *Petitioner's Second Due Process Claim*

14       Petitioner argues that the Board's denial of parole at his 2005 hearing reflects a "no

15  parole policy" for life prisoners with indeterminate sentences, or alternatively, "displays a

16  bias and predisposition to find against Petitioner at every hearing, and thus violates the basic

17  fundamentals of due process of law."  (Dkt. 1 at 21; *see id*. at 28-31.)  Although petitioner has

18  a due process right to parole consideration by a neutral, impartial decision-maker, his claim of

19  bias must be supported by the record.  *See O'Bremski v. Maas*, 915 F.2d 418, 422 (9th Cir.

20  1990) (an inmate is "entitled to have his release date considered by a Board that [is] free from

21  bias or prejudice"); *Jones v. Gomez,* 66 F.3d 199, 204-05 (9th Cir. 1995) ("[c]onclusory

22  allegations which are not supported by a statement of specific facts do not warrant habeas

01  relief."). Nothing in the record demonstrates that the Board was biased, or motivated by any

02  improper consideration such as a "no parole policy." *See Bettencourt v. Knowles,* 2009 WL

03  4755403, *17-18 (E.D. Cal. 2009) (unpublished) (holding where petitioner has offered no

04  evidence to support claim of parole bias his claim should be denied). As discussed above,

05  petitioner's case received individualized consideration by the Board during his 2005 parole

06  hearing, and the Board's decision was careful, thorough, and factually specific. Accordingly,

07  petitioner's contention should be denied.

08        D.    *Petitioner's Cruel & Unusual Punishment Claim*

09        Petitioner committed his first degree murder offense in 1974, when the Indeterminate

10  Sentencing Law ("ISL") was still in effect in California, and he received an indeterminate

11  sentence of seven-years-to-life with the possibility of parole. (*See* Dkt. 6, Ex. 1 at 1-2.)

12  Petitioner asserts that the Board is required to "fix a term of confinement and . . . set a parole

13  release date for all ISL prisoners," including himself. (Dkt. 1 at 27.) Specifically, petitioner

14  claims that his right to be free from cruel and unusual punishment under the Eighth

15  Amendment was violated by the Board's failure to set a parole release date for him, because

16  his term of imprisonment was disproportionate to his offense. (*Id.* at 2 and 30-31.) Because

17  petitioner's contentions are based upon a misunderstanding of California's repealed ISL and

18  relevant case law, they are unavailing.

19        Under the ISL, which was California's pre-1977 sentencing regime, "almost all

20  convicted felons received indeterminate terms, often with short minimums and life

21  maximums. Within this broad range, the parole authority was given virtually unbridled

22  statutory power to determine and redetermine, after the actual commencement of the

01  imprisonment, what length of time, if any, such person shall be imprisoned," and when to

02  allow them to be released on parole. *In re Dannenberg*, 34 Cal.4th 1061, 1088 (2005)

03  (internal citations omitted). The unbridled discretion afforded to the parole authority by the

04  ISL attracted criticism by reformers, and would eventually lead to the enactment of the

05  Determinate Sentencing Law ("DSL") in 1977. While the ISL was still in effect, however,

06  "[c]ontemporaneous court decisions and administrative developments, addressing problems in

07  the indeterminate sentencing law," attempted to respond to some of these criticisms. *Id.* at

08  1089. For example, petitioner cites the Chairman's Directive 75/20, which was issued by the

09  parole authority in April 1975 to create "a structure for setting parole dates based on listed

10  ranges and factors. Following this directive, numerous hearings were conducted . . . to

11  establish fixed parole dates for almost all inmates." *Id.* (*See also* Dkt. 1 at 24.) The

12  California Court of Appeal later invalidated Directive 75/20, however, because it failed to

13  base prisoners' parole release dates upon all factors relevant to their suitability for parole,

14  such as post-conviction behavior. *See In re Stanley*, 54 Cal.App.3d 1030, *8-9 (1976).

15      In *People v. Wingo*, the California Supreme Court held that in some instances, a life-

16  maximum sentence may be so grossly disproportionate, given the particular circumstances of

17  an offense, as to constitute cruel and unusual punishment under the Eighth Amendment. 14

18  Cal.3d 169, 175-80 (1975). In addition, the *Wingo* court held that if an actual parole release

19  date has been set for a prisoner by the Board, the proportionality of the prisoner's sentence

20  should be measured by that date. *See id.* at 183.

21      The California Supreme Court's decision in *In re Rodriguez*, which was issued only

22  two months after *Wingo*, further explained the Board's term-fixing responsibilities under the

01   ISL.  14 Cal.3d 639 (1975).  Specifically, *Rodriguez* held that a sentence of one-year-to-life

02   for a single incident of lewd and lascivious conduct upon a child under the age of fourteen

03   was so disproportionate to the prisoner's individual culpability under the circumstances as to

04   constitute cruel and unusual punishment.  *See id.* at 653-54; *Dannenberg*, 24 Cal.4th at 1089.

05   In addition, the *Rodriguez* court asserted that the ISL must be construed as requiring the

06   parole authority to set maximum terms for all prisoners that are proportionate to their

07   individual culpability, although this duty is clearly distinct from the parole authority's power

08   to decide if and when the prisoner is ready for parole.  *Rodriguez*, 14 Cal.3d at 652.  Finally,

09   *Rodriguez* held that where the Board has failed to set a term for a prisoner with an

10   indeterminate sentence, for the purposes of assessing the term's constitutionality under the

11   Eighth Amendment, the term will be presumed to be the maximum sentence for the prisoner's

12   offense.  *See id.* at 654 n.18.

13        In other words, although *Wingo* and *Rodriguez* held that prisoners' maximum

14   sentences must be proportionate to their culpability, these decisions did not create an

15   enforceable right for ISL prisoners to have parole release dates set by the Board.  *See Wingo*,

16   14 Cal.3d at 184.  Rather, these decisions established that the Board should set a term for ISL

17   prisoners "as a means to the end of doing a cruel and unusual punishment analysis and *not* as

18   an end to itself."  *Johnston v. Ayers*, 2009 WL 1621904, *3 (N.D. Cal. 2009) (unpublished).

19   Thus, contrary to petitioner's assertions, the Board does not have a "mandatory duty to set a

20   release date for all indeterminate life inmates, or any particular such prisoner," because "an

21   inmate must be *found* suitable *before* a release date is set. . . ."  *Dannenberg*, 34 Cal.4th at

22   1087-88 and 1093.  In a particular case, if no term has been explicitly set by the Board

REPORT AND RECOMMENDATION -23

01  because the prisoner has not yet been found suitable for parole, the prisoner's term is

02  presumed to be the statutory maximum of his sentence for the purposes of cruel and unusual

03  punishment analysis.  *See Wingo*, 14 Cal.3d at 184; *Rodriguez*, 14 Cal.3d at 654 n.18.

04       Here, the Board has not set a term of imprisonment or set a release date for petitioner

05  because he has never been found suitable for parole.  Accordingly, in order to assess

06  petitioner's claim that his sentence is so disproportionate to his first degree murder offense as

07  to constitute cruel and unusual punishment, this Court must presume that petitioner's term is

08  the statutory maximum for his offense, life imprisonment.

09       To the extent that petitioner is arguing his life sentence constitutes cruel and unusual

10  punishment under the California Constitution, his claim is not cognizable in this federal

11  habeas proceeding.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Furthermore,

12  petitioner's claim that his life sentence constitutes cruel and unusual punishment under the

13  Eighth Amendment to the U.S. Constitution also fails because the U.S. Supreme Court has

14  held that a life sentence is constitutional, even for a non-violent property crime.  *See Rummel*

15  *v. Estelle*, 445 U.S. 263, 274 (1980) (upholding a life sentence with the possibility of parole,

16  imposed under a Texas recidivist statute, for a defendant convicted of obtaining $120.75 by

17  false pretenses, an offense normally punishable by imprisonment for two to ten years);

18  *Harmelin v. Michigan*, 501 U.S. 957, 962-64 (1990) (upholding a sentence of life without the

19  possibility of parole for a defendant convicted of possessing more than 650 grams of cocaine,

20  although it was his first felony offense).  As a result, a life sentence for a first degree murder

21  such as that committed by petitioner is not so disproportionate as to constitute cruel and

22  unusual punishment under the Eighth Amendment to the U.S. Constitution.  *See Banks v.*

REPORT AND RECOMMENDATION -24

01  *Kramer*, 2009 WL 256449 (E.D. Cal. 2009) (unpublished) (holding that a Board's refusal to

02  release a prisoner who was sentenced to sixteen-years-to-life for murder does not constitute

03  cruel and unusual punishment).  Accordingly, petitioner's contentions are unavailing.

04          E.      *Petitioner's Ex Post Facto Claim*

05          Petitioner also contends that "the Board's policy of denying parole to Petitioner at a

06  denial rate of 100% of the time with over 33 real years of imprisonment thus far served is by

07  far a more harsh and burdensome sentence" than he was entitled to, because the Board has

08  "arbitrarily convert[ed] his sentence of life with parole to that of life without parole."  (Dkt. 1

09  at 2 and 30-31.)  This Court construes petitioner's argument as a claim that the Board's parole

10  denial violated petitioner's right to be free from ex post facto laws, because the Board

11  imposed a more severe penalty, a determinate life sentence, in place of petitioner's

12  indeterminate life sentence.

13          Petitioner's claim fails for multiple reasons.  First, Article I of the United States

14  Constitution provides that neither Congress nor any state shall pass an ex post facto law.

15  U.S. Const. Art. I, § 9, cl. 3, Art. I, §10, cl. 1.  The Ex Post Facto Clause therefore applies to

16  the Legislative Branch, not to the courts or an administrative body, such as the Board of

17  Parole Hearings.  *See Rogers v. Tennessee,* 532 U.S. 451, 460 (2001) (holding "[t]he

18  Ex Post Facto Clause, by its own terms, does not apply to courts"); *Marks v. United States,*

19  430 U.S. 188, 191 (1977) ("The Ex Post Facto Clause is a limitation upon the powers of the

20  Legislature, and does not of its own force apply to the Judicial Branch of government.")

21  (citations omitted)); *Lagrand v. Stewart,* 133 F.3d 1253, 1260 (9th Cir.) ("The Ex Post Facto

22  Clause does not apply to court decisions construing statutes."), *cert. denied,* 525 U.S. 971

REPORT AND RECOMMENDATION -25

01 (1998).

02      Moreover, the Board has not increased petitioner's punishment. The Ex Post Facto

03 Clause prohibits the retrospective application of criminal statutes that change the definition of

04 a crime or enhance the punishment for a criminal offense. *See Collins v. Youngblood*, 497

05 U.S. 37, 41 (1990) ("Although the Latin phrase 'ex post facto' literally encompasses any law

06 passed 'after the fact,' it has long been recognized . . . that the constitutional prohibition on ex

07 post facto laws applies only to penal statutes which disadvantage the offender affected by

08 them.") Petitioner was sentenced to seven-years-to-life with the possibility of parole. (*See*

09 Dkt. 6, Ex. 1 at 1-2.) While petitioner might have had a subjective expectation that he would

10 be released from prison sooner, the Board's decision to deny him a parole release date

11 because he presents an unreasonable risk of danger to society has not enhanced or otherwise

12 "converted" petitioner's punishment. Accordingly, the Board's decision denying petitioner a

13 parole release date did not violate the Ex Post Facto Clause, and petitioner's contention fails.

14      F.    *Alameda County Superior Court Decision*

15      In a reasoned decision denying petitioner's request for habeas relief, the Alameda

16 County Superior Court asserted that the Board's 2005 decision was supported by "some

17 evidence." (*See* Dkt. 1, Ex. P.) The superior court held that "[e]ven though Petitioner has

18 submitted numerous documents in support of his Petition, review of the transcripts provided

19 and documents pertaining to the August 2, 2005 hearing indicate that there was no abuse of

20 discretion by the Board. . . ." (*Id*. at 1.) Specifically, "[t]he record presented to this Court for

21 review demonstrates that there was certainly some evidence, including, but not limited to the

22 committing offense, which in Petitioner's case was significant, the BPT's concern about the

01   applicability of the present psychology report and how useful it was for Petitioner's situation

02   and Petitioner's need to have more specific plans for employment upon his release." (*Id.*)  As

03   a result, the superior court concluded, "There is nothing in the record that indicates that the

04   Board's decision was arbitrary and capricious, nor that Petitioner's . . . due process rights

05   were violated." (*Id.*)

06        Finally, this Court is aware that *Hayward v. Marshall*, a case pending for decision

07   before a limited en banc panel in the U.S. Court of Appeals for the Ninth Circuit, presents

08   issues sufficiently similar to those in this case that it seems likely the en banc decision will

09   have significant implications for the resolution of petitioner's case.  512 F.3d 536 (9th Cir.

10   2008), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. 2008).  If *Hayward* is decided while this

11   Report and Recommendation is pending before the presiding U.S. District Judge, he will be

12   able to take that decision into account in ruling upon this case.

13        VII.   CONCLUSION

14        Given the totality of the Board's findings, there was "some evidence" that petitioner's

15   release as of the date of the Board's decision, August 2, 2005, would have posed an

16   unreasonable risk to public safety.  As a result, petitioner's constitutional rights were not

17   violated by the Board's parole denial.  I therefore recommend the Court find that the Alameda

18   County Superior Court's Order upholding the Board's decision was not contrary to, or an

19   unreasonable application of, clearly established federal law, or based on an unreasonable

20   determination of facts.   In addition, I recommend the Court enter an Order approving and

21   adopting this Report and Recommendation, denying the petition (Dkt. 1), and directing that

22   judgment be entered dismissing this action with prejudice.

01          This Report and Recommendation is submitted to the United States District Judge

02   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

03   days of being served with this Report and Recommendation, any party may file written

04   objections with this Court and serve a copy on all parties.  Such a document should be

05   captioned "Objections to Magistrate Judge's Report and Recommendation."  Either party may

06   then respond to the other party's objections within fourteen (14) days of being served a copy

07   of such written objections.  Failure to file objections within the specified time may waive the

08   right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A

09   proposed order accompanies this Report and Recommendation.

10          DATED this 22nd day of March, 2010.

11

12

13                                           JOHN L. WEINBERG
                                             United States Magistrate Judge
14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION -28